IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 4:25-cr-010 |
| v. | ) ) ) | GOVERNMENT'S SENTENCING MEMORANDUM |
| OMAR MOHAMED NURANI, | ) ) | |
| Defendant. | ) ) | |

## CONTENTS

INTRODUCTION ........................................................................................................... 1
THE OFFENSE ............................................................................................................... 2
PROCEDURAL BACKGROUND .................................................................................. 3
VICTIMS AND RESTITUTION ..................................................................................... 3
SENTENCING GUIDELINES ........................................................................................ 4
OBJECTIONS .................................................................................................................. 4
A.  Nurani caused C.M.'s death. ................................................................................ 4
B.  Nurani's remaining objections should be overruled. ........................................... 7
C.  The Court should depart upward under USSG §5K2.1. ...................................... 7
THE SENTENCE ............................................................................................................ 9
CONCLUSION .............................................................................................................. 12

## INTRODUCTION

Defendant Omar Nurani (Nurani) distributed thousands of fentanyl pills and powder over eight unabated months. He caused the death of a customer, who overdosed on his product. He continued to sell despite that death and another arrest. The Court should sentence him to 120 months in prison.

1

## THE OFFENSE

In May 2024, Nurani started receiving fentanyl pills from co-defendant Ajang Wour. PSR ¶ 35. Wour frequently traveled to Minnesota, where he would pick up loads of fentanyl, bringing the drugs back for distribution in the Des Moines area. *Id.* ¶¶ 10, 27. Nurani was one of Wour's primary distributors. *Id.* ¶ 11. Nurani had his own customer base, and he'd get fentanyl pills or powder from Wour to sell to other distributors and users. *See id.* ¶¶ 11, 13, 15-24, 26-30. Between May 2024 and their arrests in January 2025, Wour and Nurani exchanged thousands of text messages and arranged dozens and dozens of drug deals. *Id.* ¶ 35.

On May 25, 2024, Nurani was arrested in possession of 11 fentanyl pills and $976 in cash. PSR ¶ 16. When Nurani was told he was under arrest, he yelled at the other man in the car to wipe Nurani's phone. *Id.* ¶ 17. When his phone and money were seized, he wrote "Fuckyou" on the property receipt. *Id.* He was charged by the state with possession of a controlled substance with intent to deliver (fentanyl), and bonded out of custody on May 30. *Id.* ¶¶ 18-19.

Right after he bonded out of custody, he messaged his contact and fentanyl customer, C.M., that he had been "locked up" and just "got out." PSR ¶ 19. He then asked her, "Do you need any?" *Id.* A few days later—on June 6—C.M. ordered five fentanyl pills from Nurani. *Id.* ¶¶ 20-21. Wour was on his way back from a trip to Minnesota to get fentanyl pills, and Nurani immediately asked Wour if he was close to the city [Des Moines] because Nurani had a "couple plays" [customers or sales]

2

waiting on him. *Id.* ¶ 21. Wour said he was, and the two met up around 3:30 a.m., so Wour could give Nurani the fentanyl pills. *Id.*

Nurani told C.M. that he was meeting with his source (Wour). PSR ¶ 21. Nurani and C.M. had agreed on a price and quantity: five pills for $65. *Id.* Nurani instructed C.M. to send the money via CashApp to Nurani's girlfriend and gave C.M. that username. *Id.* C.M. sent $65 to Nurani's girlfriend. *Id.* Less than an hour later, Nurani arrived at C.M.'s apartment building. *Id.* ¶ 22. After a short meeting—when Nurani gave her five fentanyl pills—C.M. went back into her apartment. *Id.* C.M. died of a fentanyl overdose, likely in the early morning hours of June 8. *Id.* ¶¶ 23-24.

After C.M.'s death, Nurani continued to sell fentanyl pills, eventually moving to selling fentanyl powder. PSR ¶¶ 26-30. All told, Nurani obtained and distributed over 2,000 fentanyl pills and 8 ounces of fentanyl powder. *Id.* ¶ 11.

## PROCEDURAL BACKGROUND

Nurani was charged by Indictment with conspiracy to distribute 40 grams or more of fentanyl (Count 1) and distributing fentanyl (Counts 2 and 3). Nurani pled guilty to Count 1; Counts 2 and 3 will be dismissed at the time of sentencing.

## VICTIMS AND RESTITUTION

As discussed further, C.M. is an identified victim. At the time of this filing, the government has received a victim impact statement from a family member, which is filed under seal as Government's Exhibit 2. Should the government receive any further written victim impact statements, it will provide them to the Court. One or more victims is expected to make an oral statement to the Court at the time of

sentencing. At the time of this filing, the government has received no requests for restitution.

## SENTENCING GUIDELINES

The presentence investigation report (PSR) correctly calculates the advisory guidelines range in this case as follows:

| | |
|---|---|
| Base Offense Level (§2D1.1(a)(5), (c)(3) | 30 |
| <u>Acceptance of Responsibility (§3E1.1)</u> | <u>-3</u> |
| Total Offense Level | 27 |
| Criminal History Category | I (0) |
| Guidelines Sentencing Range: | 70 to 87 months' imprisonment |

## OBJECTIONS

Nurani has factual and legal objections to the PSR, primarily centering on the distribution to C.M. on June 6 and C.M.'s resulting death. As a factual matter, Nurani disputes that the facts, messages, surveillance video, and timeline in the PSR establish by a preponderance of the evidence that the fentanyl Nurani sold C.M. on June 6 resulted in her death. Nurani's legal objections—including his ineligibility for the zero-point offender reduction and the applicability of the upward departure under §5K2.1—flow from this contested factual issue.

### A. Nurani caused C.M.'s death.

The below facts are undisputed:

- Nurani was a fentanyl source of supply for customer C.M. He had sold her fentanyl before.

- On June 6, 2024, beginning at 12:39 a.m., C.M. asked Nurani for fentanyl pills. Nurani and C.M. agreed on five pills for $65. Over the

4

course of the next several hours, C.M. repeatedly checked in with Nurani on when they'd be able to do the deal.

- Nurani got fentanyl pills from Wour around 3:40 a.m., but used himself and "nodded off" before he met up with C.M.

- Between 3:45 a.m. and 1:02 p.m., C.M. made five unanswered calls to Nurani and sent multiple text messages checking on Nurani's status and availability to do the deal.

- At 1:07 p.m., C.M. messaged another contact, "hey u got any?" That contact never responded and C.M. had no further communication with that contact.

- At 3:56 p.m., Nurani called and messaged C.M., explaining that he had nodded off. Over the next two hours, the two planned to meet to do the deal. At Nurani's direction, C.M. sent $65 to Nurani's girlfriend as payment for five fentanyl pills.

- Shortly after 5:30 p.m., Nurani and C.M. met in Nurani's car. C.M. carried a small, wristlet bag. Nurani provided C.M. with fentanyl during this meet. In total, Nurani and C.M. were together for less than 15 minutes.

- C.M. returned to her apartment at 5:46 p.m. Just two minutes later, she left for about 10 minutes, returning to her apartment for the final time at 5:59 p.m. on June 6.

- After C.M. met with Nurani on June 6, C.M. did not send or receive any messages consistent with arranging or purchasing fentanyl pills.

- C.M.'s last outgoing communication was June 8 at 5:56 a.m., which is believed to be her likely time of death. C.M. did not leave the apartment between June 6 at 5:59 p.m. and her death. Other than C.M.'s roommate, no one else entered or visited the apartment during this time.[1]

- C.M. was found on her bed. Near her body was the wristlet she had carried when she met with Nurani, a mirror (often used as a surface for ingesting drugs), and snort indicia. A single fentanyl pill was found in the wristlet.

---

[1] C.M.'s roommate had not seen C.M. since June 5, 2024.

5

These facts establish, by a preponderance of the evidence, that the fentanyl pills Nurani sold to C.M. caused C.M.'s death. C.M. didn't already have the pills she ingested; she repeatedly and desperately contacted Nurani over 16 hours to get them. And, despite Nurani's claim that C.M. had "numerous sources," (Def. Obj. ¶ 3), she waited for Nurani to get back to her for much of that day and didn't reach out to anyone else. It was only after C.M. made five unanswered phone calls to Nurani that C.M. appeared to try another source—sending a single message, "hey u got any?" In other words, C.M. wasn't "requesting more pills," (Def. Obj. ¶ 3) she was requesting pills from an alternative source when Nurani didn't respond. But she had no more contacts with that potential source, and Nurani did respond two hours later, setting up the deal.

There is no evidence that C.M. received any fentanyl pills from another source on June 6 or any time after. Nurani speculates that because C.M. "left her apartment for a short period of time," then "she could have been meeting another drug source." (Def. Obj. ¶ 3). C.M. left her apartment for 10 minutes, immediately following her meeting with Nurani, where she received five fentanyl pills. There would be no reason for her to meet with another source right afterward; she had just gotten the five pills she'd been trying to get.

Finally, Nurani suggests that because C.M. was still sending messages on June 8, she could have "received additional pills" after getting pills from Nurani. But, again, there are no messages on C.M.'s phone or other contacts indicative of her getting fentanyl from someone other than Nurani. She did not leave her apartment

after 5:59 p.m. on June 6, did not have any visitors to her apartment, and did not see her roommate. Nurani's speculation that C.M. could have gotten pills from someone else is wholly unsupported by the undisputed facts.

Instead, the evidence plainly shows it's more likely than not that Nurani sold C.M. five fentanyl pills on June 6, and she ingested four of those pills over the next 36 hours, ultimately overdosing and dying in the early morning hours of June 8.

### B. Nurani's remaining objections should be overruled.

If the Court finds by a preponderance of the evidence that Nurani's distribution resulted in C.M.'s death, then his remaining objections can be overruled. Nurani does not qualify as a zero-point offender under USSG §4C1.1 because the offense resulted in death or serious bodily injury. *See* USSG §4C1.1(a)(4). He is similarly disqualified from safety-valve eligibility, though he did not otherwise meet the criteria anyway because he failed to debrief truthfully with the government. *See* USSG §5C2.1(a)(3), (5); 18 U.S.C. § 3553(f)(3), (5).

### C. The Court should depart upward under USSG §5K2.1.

Nurani objects to the application of USSG § 5K2.1, which contemplates an upward departure from the guidelines range where death resulted from the defendant's conduct. Although Nurani may not have intended C.M.'s death, he put "into motion a chain of events that risk[ed] serious injury or death." *United States v. Diaz*, 285 F.3d 92, 101 (1st Cir. 2002). An upward departure is warranted.

In determining the extent of the departure, the Court should consider, "the dangerousness of the defendant's conduct, the extent to which death or serious injury

was intended or knowingly risked, and the extent to which the offense level for the offense of conviction . . . already reflects the risk of personal injury." USSG §5K2.1.

With respect to the latter concern: the current guidelines simply don't reflect the risk of personal injury. Rather, the guidelines in this case are driven exclusively by the drug quantity attributed to Nurani—the amount of fentanyl he put into the community. The guidelines specifically contemplate the appropriate base offense level where death results from a defendant's conduct: 38. A base offense level short of that necessarily fails to capture the loss of life.

The greater driver, however, is Nurani's incredibly dangerous and knowingly risky conduct. In this instance, he supplied fentanyl to C.M., knowing that she was a fentanyl user. He knew that she would take the fentanyl and—as a significant user himself—knew of the risk she could overdose. In fact, Nurani initially denied he used fentanyl because it was deadly. *See* GX 1 (relevant excerpts from Nurani's post-*Miranda* interview report). Although Nurani himself denied overdosing, his girlfriend had and Nurani had witnessed a friend overdose and had to take them to the hospital. *Id.* He had heard of others overdosing too. *Id.* Nurani knew and undertook the risk that any pill he sold could kill the user.

Courts have routinely applied and affirmed upward departures under §5K2.1 in similar circumstances. *See, e.g.*, *United States v. Watley*, 46 F.4th 707, 716-17 (8th Cir. 2022) (affirming an upward departure of seven levels where the defendant's drug distribution "played a central part" in the victim's death); *United States v. Nossan*, 647 F.3d 822, 826-27 (8th Cir. 2011) (affirming an upward departure from a

8

guidelines range of 10 to 16 months to a sentence of 60 months, where the defendant's drug distribution caused the victim's death); *United States v. Mousseau*, 517 F.3d 1044, 1048-49 (8th Cir. 2008) (affirming an upward departure from a guidelines range of 70 to 87 months to a sentence of 120 months, where the defendant's distribution of an unknown substance, believed to be narcotics, caused the victim's death); *United States v. Sweger*, 413 Fed.Appx. 451, 455-56 (3d Cir. 2011) (affirming an upward departure from a base offense level of 18 to a base offense level of 38, where the defendant's distribution of fentanyl-laced heroin caused the victim's death); *United States v. Grover*, 486 F.Supp.2d 868, 886-88 (N.D. Iowa 2007) (departing upward from a base offense level 14 to a base offense level of 24, where the defendant's distribution of heroin caused the victims' death); *United States v. Millikan*, S.D. Iowa Criminal No. 4:22-cr-008-SMR (departing upward from a guidelines range of 10 to 16 months to a sentence of 24 months, where the defendant's distribution of fentanyl caused the victim's death).

Given the dangerousness and recklessness of Nurani's conduct, an upward departure to 120 months in prison is warranted.

## THE SENTENCE

Even if the Court declines to depart upward, it should impose a sentence of 120 months in prison because that sentence is "sufficient but not greater than necessary" to achieve the goals of sentencing. *See* 18 U.S.C. § 3553(a).

First, Nurani's part in C.M.'s death warrants a substantial upward variance from the guidelines range. *See, e.g.*, *United States v. Reif*, 920 F.3d 1197, 1198 (8th

9

Cir. 2019) (affirming an upward variance from a guidelines range of 15 to 21 months to a sentence of 96 months where the defendant's distribution of heroin caused the victim's death); *United States v. Denson*, 967 F.3d 669, 709 (8th Cir. 2020) (affirming an upward variance from a guidelines range of 210 to 262 months to a sentence of 292 months where the two victims connected to the conspiracy the defendant was involved in died as a result of their drug use); *United States v. McKinnie*, 21 F.4th 283, 288-290 (4th Cir. 2021) (affirming an un upward variance from a guidelines range of 21 to 27 months to a sentence of 120 months because the defendant's distribution of fentanyl contributed to the victim's death); *United States v. Hudgens*, 4 F.4th 352, 358-59 (5th Cir. 2021) (affirming an upward variance from a guidelines range of 120 to 121 months to a sentence of 240 months where the defendant's relevant conduct included supplying his girlfriend with methamphetamine and contributed to her death); *United States v. Hawkins*, S.D. Iowa Criminal No. 4:24-cr-114-SMR (imposing an upward variance from a guidelines range of 21 to 27 months to a sentence of 60 months because the defendant's distribution of fentanyl caused the victim's death); *United States v. Clark*, S.D. Iowa Criminal No. 4:23-cr-137-SMR (imposing an upward variance from a guidelines range of 24 to 30 months to a sentence of 48 months because the defendant's distribution of a heroin and fentanyl mixture contributed to the victim's death).

And that distribution was sandwiched between Nurani's other alarming conduct. He was arrested in May 2024 for possession of a distribution-quantity of fentanyl and with $976 in drug proceeds. He was charged and bonded out. But that

arrest didn't stop anything. Immediately after he was released from jail, he reached out to his customers, including C.M., to ask if they needed fentanyl pills. Eight days later, C.M. was dead of a drug overdose. Her death didn't stop Nurani either; he continued to sell fentanyl pills throughout the summer and fall, eventually moving to fentanyl powder. In October 2024, Nurani pled guilty to possession of fentanyl with intent to deliver. A couple weeks later, he sold 100 fentanyl pills to a confidential source.

Nurani had a safe and stable upbringing, with solid familial support. He reported becoming a heroin and fentanyl addict at the age of 22 (his current age), but that would mean he was selling fentanyl for several months before he was an addict. He hasn't had a reliable, legal job since 2021. Although there's no doubt Nurani's addiction played a part in his crimes, he's had other interventions and opportunities for treatment that he didn't take or complete. PSR ¶¶ 82, 83.[2] And Nurani, as a fentanyl user who has witnessed others overdose, certainly knows the danger he is causing by selling fentanyl.[3]

---

[2] In June 2024, Nurani received a substance abuse evaluation and, presumably, recommended treatment stemming from his state arrest. PSR ¶ 83. Nurani reported that he was unable to participate in substance use treatment due to his arrest in this case. *Id.* It's not clear why Nurani's arrest in January 2025 prevented him from participating in substance abuse treatment for the seven entire months before that.

[3] Between 2016 and 2021, the rate of fentanyl overdose deaths increased by 279%, from 5.7 per 100,000 standard population in 2016 to 21.6 in 2021—a growth rate and death rate that far surpass any of the other drugs reviewed. *See* Spencer et al., *Estimates of Drug Overdose Deaths Involving Fentanyl, Methamphetamine,*

11

Nurani's continued fentanyl distribution, despite a law enforcement intervention and the death of his customer, warrant an upward variance.

## CONCLUSION

The Court should impose a sentence of 120 months' imprisonment.

          Respectfully submitted,

          Richard D. Westphal
          United States Attorney

By:   */s/ Mikaela J. Shotwell*
       Mikaela J. Shotwell
       Ryan W. Leemkuil
       Assistant United States Attorneys
       Neal Smith Federal Building
       210 Walnut Street, Suite 455
       Des Moines, Iowa 50309-2053
       Tel: (515) 473-9300
       Email: Mikaela.Shotwell@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2025, I electronically filed the foregoing with the Clerk of Court using the CM ECF system. I hereby certify that a copy of this document was served on the parties or attorneys of record and the United States Probation Officer by:

____ U.S. Mail   ____ Fax   ____ Hand Delivery

_X_ ECF/Electronic filing   __ Other means (email)

UNITED STATES ATTORNEY
By:   */s/Mikaela J. Shotwell*

---

*Cocaine, Heroin, and Oxycodone: United States 2021*, Vital Statistics Rapid Release, available at https://www.cdc.gov/nchs/data/vsrr/vsrr027.pdf.