IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | Case No. 4:25-cr-010-SHL |
| v. | |
| OMAR MOHAMED NURANI, | DEFENDANT'S SENTENCING MEMORANDUM AND BRIEF IN SUPPORT OF DOWNWARD VARIANCE |
| Defendant. | |

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. WITNESSES AND EXHIBITS ..............................................................................2

III. ISSUES ....................................................................................................................2

IV. ARGUMENT ..........................................................................................................3

    A. Outstanding PSR Factual Objections............................................................3

    B. Outstanding Guideline Objections ................................................................5

    C. The § 3553(a) Factors Support a Sentence Below the Advisory Guideline Range .....11

    D. Restitution ...................................................................................................19

V. CONCLUSION .....................................................................................................20

## I. INTRODUCTION

Defendant Omar Mohamed Nurani faces sentencing after pleading guilty to one count of conspiracy to distribute a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. The government agreed to dismiss counts two and three of the indictment at sentencing.

Mr. Nurani's sentencing requires the resolution of the following issues:

(1) Mr. Nurani's outstanding factual objections to the presentence investigation report (PSR);

(2) Mr. Nurani's objections to the guideline applications in ¶¶ 38, 49, 117 (with regard to the death of C.M. as it relates to USSG § 4C1.1 and § 5K2.1), and

(3) The appropriate sentence to impose.

Mr. Nurani asks the Court to consider this memorandum and brief in support of a downward variance in connection with his sentencing.

## II. WITNESSES AND EXHIBITS

Mr. Nurani does not intend to call any witnesses at the sentencing hearing. He plans to offer the following exhibits at this time:

Exhibit A: Video of entry to C.M.'s apartment (under seal);

Exhibit B: Texts between C.M. and Jesus (under seal);

Exhibit C: Texts between C.M. and Mr. Nurani (under seal);

Exhibit D: Text between C.M. and Sonya (under seal);

Exhibit E: Ajang Wour Interview (under seal);

Exhibit F: EFR evaluation; and

Exhibit G: Substance Abuse Class Certificate.

## III. ISSUES

By statute, count one carries a mandatory minimum of five years and a maximum of forty years' imprisonment. The Court must impose a term of supervised release of at least four years. A $100.00 special assessment is mandatory.

The applicable advisory guideline range of imprisonment is in dispute with regard to the lack of a downward adjustment for certain zero-point offenders (USSG § 4C1.1). If the Court

does not adjust the advisory guideline range, Mr. Nurani will ask the Court to vary downward to the mandatory minimum for the reasons discussed below.

IV. **ARGUMENT**

    A. **Outstanding PSR Factual Objections.**

While Mr. Nurani acknowledges these objections do not impact the applicable advisory guideline range, they may be relevant to the Court's § 3553(a) analysis.

With regard to Alias and Alternate IDs, Mr. Nurani has never used another name or social security number. His identity was stolen in Minnesota, and it is believed that may be where this information comes from.

Mr. Nurani updates PSR paragraph 7, while at the Polk County Jail, Mr. Nurani has completed the substance abuse course. *See* Ex. G. He has also completed eight courses on the tablet.

Regarding PSR paragraph 20, 23, 38, Mr. Nurani objects that the evidence is sufficient to establish that the fentanyl that caused C.M.'s death is attributable to him. C.M.'s death is a tragedy, that is not disputable, but her willful acts should not lead to an increased punishment for Mr. Nurani. There is no affirmative evidence to show that the pills that C.M. took causing her to overdose were from Mr. Nurani. C.M. had numerous sources for drugs, including "Jesus." Ex. B. In a conversation she had with Mr. Nurani in May, she spoke of her friend overdosing by taking pills from a "Mexican." Ex. C. This is the same friend who C.M. messaged on June 6, 2024, about buying pills in Phoenix and selling them. Ex. D. While C.M. appeared to meet with Mr. Nurani on June 6, 2024, there is no irrefutable proof that she got pills from him. Even if she did, it is more likely than not that Mr. Nurani and C.M. ingested those pills in the car before she

3

came back to the apartment. Mr. Nurani did not overdose after using the pills he received from Mr. Wour. C.M. texted Mr. Nurani about going to the gas station to get some food, she was gone longer than a quick hand to hand drug transaction, and she came back into her apartment with a white plastic bag that likely contained something from the gas station. Ex. A. The fact C.M. was texting another source asking for pills on the afternoon of June 6, 2024, shows she was requesting drugs from someone else she had a relationship with and who also knew her roommate. Ex. B. C.M. also left her apartment after meeting with Mr. Nurani for a short period of time, indicating she could have been meeting another drug source. Ex. A. C.M. has the same wristlet that was found by her body during her last trip outside the apartment. *Id*. Based on her text messages, less than a month prior, C.M. was getting "lit" with her roommate (at 4:00 a.m.) and that same roommate came and went from their apartment four times on June 6th and 7th. *See* Ex. A, B. Her roommate could have also brought back fentanyl any of those times. C.M. was an addict who sought pills on an almost daily basis. C.M. was still sending messages on the morning of June 8, 2024, which also shows she was still alive and could have already had pills from other sources or received additional pills after meeting with Mr. Nurani.

Mr. Nurani objects to the consideration of victim impact in PSR ¶ 38, due to the lack of proof that he was the cause of C.M.'s death.

With regard to ¶ 41, Mr. Nurani objects that he is ineligible for safety valve because a death was involved as discussed above. He is not stating he is eligible for safety valve, he is just not ineligible for that particular reason.

Mr. Nurani provides further information regarding PSR ¶ 67. Ms. Johnson gave birth to their daughter, Alina, prematurely at Broadlawns last month. After being transferred to

4

University of Iowa Hospitals and Clinics, she passed away after living only two and a half weeks.

With regard to PSR ¶ 70, Mr. Nurani has serious dental problems. He has eight teeth that need to be pulled as they are rotted, and he will need a partial after they are removed. He has repeatedly requested to see a dentist, with his first request over three months ago, but he is still waiting to see one.

With regard to PSR ¶80, Mr. Nurani first tried what he was told were Percocet pills at the age of eighteen in 2020, after trying one from a friend. Within a month he was addicted and was using it daily. These M30 pills turned out to be fentanyl. When he could not find pills, he turned to heroin.

With regard to PSR ¶82, once Mr. Nurani realized he was addicted to the pills, he went to the methadone clinic for an evaluation. However, when he realized that insurance paperwork would be sent to his home, he got scared and did not go through with the treatment because he did not want his mom to know.

Mr. Nurani objects to any restitution request in PSR ¶ 113, and to the corresponding supervised release conditions in PSR ¶¶ 119-121.

B. **Outstanding Guideline Objections.**

1. **Mr. Nurani is a Zero-Point Offender and Should Receive the Downward Adjustment.**

With regard to PSR ¶¶ 49, 52, 56, Mr. Nurani objects that he was not given the two-level reduction in USSG § 4C1.1 for being a zero-point offender, as C.M.'s death did not result from the offense of conviction.

The government cannot establish that Mr. Nurani was the but for cause of C.M.'s death. As indicated in the objection above regarding the underlying facts, there is a real question where the fentanyl came from which resulted in C.M.'s death. The government makes assumptions, first that Mr. Nurani was Mr. Wour's "primary" distributor, and second that Mr. Nurani actually distributed five fentanyl pills on June 6, 2024. No one actually knows what happened with C.M. between June 6th and 8th. Given the exhibits provided by Mr. Nurani, it appears just as likely that C.M. obtained fentanyl after she saw Mr. Nurani. Particularly because she was a regular user and used with a number of people, including her roommate.

The Sentencing Commission drafted the amended § 4C1.1 to ensure defendants with low recidivism rates were not sentenced to unjustly lengthy prison sentences. Citing zero-point offenders' "considerably lower recidivism rates than other offenders"—including those offenders with only one criminal history point, who have a re-arrest rate of 42.3% compared to the 26.8% rate for zero-point offenders—the Commission approved a two-level downward departure for zero-point offenders not otherwise excluded. Memorandum from the Off. of Rsch. & Data & the Off. of Gen. Couns. to Chair Reeves, Commissioners & Ken Cohen, Staff Dir. 4–5 (May 15, 2023) (on file with the U.S. Sentencing Commission).

Mr. Nurani is still significantly less likely than even a one-point offender to recidivate.[1] Moreover, the circumstances of his offense are mitigating. Thus, in keeping with the language of the amendment and considering the circumstances around the offense, the Court should apply the adjustment for zero-point offenders.

---

[1] Among zero-point offenders *with* prior contact with the criminal justice system, the rearrest rate is 32.7%. *Id.*

If the Court applies the zero-point offender decrease of two points, with acceptance of responsibility, Mr. Nurani's Total Offense Level would be 25. With a criminal history category I, his advisory guideline range would be 60 to 71 months in PSR ¶ 102.

**2. The Court should not depart or vary above the already-severe range recommended by the advisory guidelines.**

With regard to PSR ¶ 117, Mr. Nurani objects that an upward departure is appropriate in this case. Even if the Court finds by a preponderance of the evidence that C.M. fatally overdosed on fentanyl she obtained from Mr. Nurani, the Court should decline to upwardly depart or vary, or at least decline to do so to the degree advocated for by the government.

The government asks this Court to, based on allegations it submits are proven to be more-likely-than-not true, send Mr. Nurani to federal prison for twice the mandatory minimum sentence in this case. Such a drastic increase, without application of the Rules of Evidence or a finding by a jury that he committed the offense alleged, raises concerns under the Sixth Amendment and the Fifth Amendment's Due Process Clause. Departing upward consistent with the government's recommendation would effectively result in a judicial finding of guilt, based on a preponderance of the evidence, related to a separate and uncharged offense, and punishment based on the same.

The Sixth Amendment provides a criminal defendant the "[r]ight to have a jury find the facts behind his punishment." *Hurst v. Florida*, 577 U.S. 92, 98 (2016). As this principle "extends down centuries into common law." *Apprendi v. New Jersey*, 530 U.S. 466, 477 (2000) (citing *United States v. Gaudin*, 515 U.S. 506, 510–11 (1995)). When it comes to the reasonableness of a sentence, a judge-found fact should not shift the reasonableness window; only a jury can do that. *See Alleyne v. United States*, 570 U.S. 99 (2013); *see also Jones v.*

*United States*, 574 U.S. 948 (2014) (Scalia, J., dissenting from denial of cert.) ("It unavoidably follows that any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence—is an element that must be either admitted by the defendant or found by the jury. It *may not* be found by a judge."); *United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring with denial of petition for rehearing en banc) ("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial. If you have a right to have a jury find beyond a reasonable doubt the facts that make you guilty, and if you otherwise would receive, for example, a five-year sentence, why don't you have a right to have a jury find beyond a reasonable doubt the facts that increase that five-year sentence to, say, a 20-year sentence?"); *United States v. Galloway*, 976 F.2d 414, 436-44 (8th Cir.1992) (Bright, J., dissenting) ("If the former Soviet Union or a third world country had permitted [the practice of punishing people for conduct that had not been the subject of indictment or trial], human rights observers would condemn those countries."). If the government wanted Mr. Nurani sentenced for the death of C.M., the Fifth Amendment requires the government to present that charge to a grand jury, and the Sixth Amendment provides Mr. Nurani the right to challenge that accusation at a speedy and public trial before an impartial jury. Mr. Nurani preserves a challenge to his sentence under the Fifth and Sixth Amendments.

The cases cited by the government both for an upward departure or variance do not support the imposition of one in this case. In *United States v. Watley*, 46 F.4th 707 (8th Cir. 2022) the defendant went to trial and one of the victim's testified that the heroin came from the defendant. Watley also received an increase in the sentence for distributing additional drugs. In

8

*United States v. Nossan*, 647 F.3d 822 (8th Cir. 2011), there is no indication that the victim had other drug sources. The defendant in *United States v. Mousseau*, 517 F.3d 1044 (8th Cir. 2008) directly delivered methamphetamine to a minor who then died. In *United States v. Grover*, 486 F. Supp. 2d 868, 873 (N.D. Iowa 2007), the jury declined to find the distribution resulted in death but the evidence at trial showed a direct sale where the defendant told the victim to "be careful" because the heroin was extra potent. In *United States v. Denson*, 967 F.3d 699 (8th Cir. 2020), the defendant received enhancements for a criminal livelihood and a four-level leader enhancement role, however the case is unclear on what evidence was presented regarding the deaths involved. Given the lack of testimony and direct evidence involved in Mr. Nurani's case, an upward departure or variance is not appropriate.

Constitutional concerns aside, the Court should decline to depart upward from the already-severe sentence recommended by the guidelines. USSG § 5K2.1 instructs sentencing courts to consider "matters that would normally distinguish among levels of homicide." And the guidelines provide a framework for homicide offenses in §§ 2A1.1 through 2A1.4. Assuming the Court finds the government has shown C.M. died from overdosing on the heroin she obtained from Mr. Nurani, and because the government concedes Mr. Nurani did not intend C.M.'s death, this would be most akin to involuntary manslaughter. Consequently, the Court should look to USSG § 2A1.4, the guideline for involuntary manslaughter, for guidance in determining the appropriate sentence to impose. USSG § 2A1.4(a) provides for a base offense level 12 where the offense involved criminally negligent conduct or 18 where the offense involved reckless conduct.[2] Even assuming the heightened base offense level for recklessness applies, Mr.

---

[2] "Criminally negligent" is defined as "conduct that involves a gross deviation from the standard of care that a reasonable person would exercise under the circumstances, but which is not

9

Nurani's base offense level would be 18, and after a three-point reduction for acceptance of responsibility, his total offense level would be 15. *See* USSG § 2A1.4(a)(2)(A). With a criminal history category I, the guideline range would be 18 to 24 months' imprisonment, which is lower than the guideline range under § 2D1.1. Consequently, the Court should deny the government's motion for an upward departure under USSG § 5K2.1.

Should the Court determine that some upward departure beyond the recommended guideline range is necessary, it should reject the 120-month sentence advocated for by the government as far greater than necessary. First, the factors listed for consideration in USSG § 5K2.1 do not support such a drastic increase from the advisory range.[3] To the extent C.M. overdosed on fentanyl from Mr. Nurani, he indisputably did not intend C.M.'s death, nor did he exercise any degree of planning or preparation to cause her death. Multiple deaths were not involved. The means by which C.M.'s life was taken constitute a mitigating fact—C.M.

---

reckless. Offenses with this characteristic usually will be encountered as assimilative crimes." USSG § 2A1.4 comment. n.1. "Reckless" is defined as "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." *Id.*

[3] USSG § 5K2.1 instructs courts to consider:

> matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and degree of planning or preparation. Other appropriate factors are whether multiple deaths resulted, and the means by which the life was taken. The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by the other Chapter Two guidelines, already reflects the risk of person injury. For example, a substantial increase may be appropriate if the death was intended or knowingly risked or if the underlying offense was one for which base offense levels do not reflect an allowance for the risk of personal injury, such as fraud.

voluntarily chose to ingest the substances that led to her overdose with the knowledge that people she knew had previously overdosed.  Section 5K2.1 also lists several factors for consideration in the extent of an increase, including the "dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the offense of conviction, as determined by [USSG § 2D1.1], already reflects the risk of personal injury."  Here, although Mr. Nurani was aware that fentanyl use came with risk due to his own battle with addiction to it, he had no intention for C.M. to be harmed.  Mr. Nurani was also acutely aware of the dangers associated with opiate withdrawal outside of a medical setting—in fact, medical professionals recommend against abrupt cessation of opioid use.[4]  Most importantly of all, the offense guideline under USSG § 2D1.1 already account for the risks associated with fentanyl.

### C. The § 3553(a) Factors Support a Sentence Below the Advisory Guideline Range.

If the Court does not adjust the advisory guideline range as argued above, Mr. Nurani would request a downward variance, to the mandatory minimum, both for the reasons described above, and due to Mr. Nurani's young age, lack of prior criminal history, and his severe addiction issues.

The guidelines are only one of many factors a court must consider in fashioning an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Mr. Nurani asks the

---

[4] Mansi Shah & Martin R. Huecker, *Opioid Withdrawal*, StatPearls Publishing (May 21, 2021), https://www.ncbi.nlm.nih.gov/books/NBK526012/ ("The patient should also be advised not to stop taking opioids abruptly, and if they wish to discontinue using opioids, they should consult a physician for medically supervised detoxification."); *Tapering Off Opioids:  When and How*, Mayo Clinic (May 20, 2021), https://www.mayoclinic.org/diseases-conditions/prescription-drug-abuse/in-depth/tapering-off-opioids-when-and-how/art-20386036.

Court to consider the following factors—many of which are not accounted for by the guidelines—in deciding on a sentence.

*Nature and Circumstances of the Offense.* Mr. Nurani's offense was indisputably serious. He is an opioid addict, and he understands that he helped other addicts have access to drugs. For that conduct, punishment is appropriate. At the same time, Mr. Nurani's offense does not rise to the level of severity of many other drug offenses prosecuted in federal court. Mr. Nurani's conspiracy offense began due to his addiction and receiving "help" from Mr. Wour when he was in withdrawal. Ex. E. Mr. Wour would subsequently use Mr. Nurani as a guinea pig to "test" the new fentanyl powder that Mr. Wour received. *Id*. Mr. Wour took advantage of someone half his age, an immigrant, and an addict, who he knew had been robbed and who had to sell drugs to keep up with his daily addiction. *Id*.

The instant offense involves distribution of "M30" pills which contained fentanyl. During the entire time he was selling pills, he was actively taking them as well. He wanted to stop taking the pills, but he would suffer from withdrawal symptoms if he stopped using them. Mr. Nurani's crime started with the stupid, immature decision to try a pill his friend had. He did not realize at the time the life altering consequences that would follow.

*Addiction.* Mr. Nurani's substance abuse started in his early teenage years, when he did not have the maturity or insight to understand the lifelong implications. Mr. Nurani's struggles with addiction began when he first used marijuana at thirteen years old. *See* PSR ¶ 73. He experimented with a number of drugs as a teen, but his use of opiates is what took over and consumed his life. *Id*. at 80-81. Mr. Nurani was addicted to fentanyl before he even knew that was what was in the M30 pills he was taking. While he took the first step to seek treatment, he

12

was too scared to go through with it because he did not want his mom to know of his failing through his addiction. His substance-abuse problem explains why he "sadly, but predictably, made poor decisions based on impulse and immaturity." *United States v. Hendrickson*, 25 F. Supp. 3d 1166, 1175 (N.D. Iowa 2014).

Mr. Nurani's arrest and incarceration led to difficult withdrawal symptoms from the opioids when he was in the detox unit at the Polk County Jail for one and a half weeks. Detoxing in a jail setting is one of the worst things he has had to do. Mr. Nurani has learned so much about his addiction and being sober during his incarceration and through the substance abuse course. Ex. G. While previously screened and recommended for treatment, Mr. Nurani has not had the benefit of substance abuse treatment. He was deeply in the throes of his addiction for the entirety of his offense, and why he committed the offense. He knows that he would benefit from substance-abuse treatment, which is why he requested an evaluation in jail. Ex. F. EFR recommended inpatient treatment. *Id*.

Mr. Nurani is committed to future substance-abuse treatment—both while in custody, and following his release, in recognition that it will be a daily commitment for the rest of his life. He has had to admit his addiction to his family and his loved ones stand ready to support him through his recovery. Extensive drug treatment affords Mr. Nurani, who is still young enough to change, the ability to live a long life as a productive citizen. "[S]uccessful completion of drug treatment combined with new vocational skills would increase his employment possibilities upon release and substantially decrease the likelihood of his recidivism." *United States v. Amaya*, 949 F. Supp. 2d 895, 919 (N.D. Iowa 2013).

***Youth.*** Mr. Nurani's background, characteristics, and prospects for rehabilitation are entirely mitigating and his age is a significant mitigating factor. Mr. Nurani was just twenty-one years old when he committed this offense. Today, he is twenty-two years old. "Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five." *United States v. Gall*, 374 F. Supp. 2d 758, 762 n.2 (S.D. Iowa 2005) (Pratt, J.).

Mr. Nurani is an "emerging adult"—that is, a person who has reached eighteen years old but is not older than twenty-five. Melissa S. Caulum, *Postadolescent Brain Development: A Disconnect Between Neuroscience, Emerging Adults, and the Corrections System*, 2007 Wis. L. Rev. 729, 731 (2007). During emerging adulthood, the brain is still developing, "particularly in the areas of judgment, reasoning, and impulse control." *Id.* Thus, as is true of juveniles, offenders who are twenty-five or younger "can similarly have lessened moral culpability and blameworthiness as a result of their youth and immaturity." Kelsey B. Shust, Comment, *Extending Sentencing Mitigation for Deserving Young Adults*, 104 J. Crim. L. & Criminology 667, 693 (2014); *accord United States v. Nash*, 1 F. Supp. 3d 1240, 1246 (N.D. Ala. 2014) ("[U]ntil age 25, the part of the brain that governs judgment, decision-making[,] and impulse control is still in the developmental process. Male brains specifically develop even more slowly than female brains; female brains develop an average of two years earlier than male brains.").

Beyond lessening his culpability, Mr. Nurani's age limits the deterrent value of a sentence of imprisonment. *See United States v. Bannister*, 786 F. Supp. 2d 617, 660 (E.D.N.Y. 2011) ("Deterrent power of either type…may be similarly affected among young people due to

14

the natural rate of brain development."). Minimizing his exposure to the harms associated with a prison setting while his brain is still developing will place him in the best position to put himself on a positive path forward.

Notwithstanding his crime, Mr. Nurani's future holds promise. He has aspirations to earn a college degree in computer science. While in Polk County Jail, Mr. Nurani has spent his time completing online courses to learn more about himself and the better choices he has for the future. Mr. Nurani maintains strong relationships with his family, providing him with support that will help curb recidivism moving forward. Continued treatment and educational programming will afford Mr. Nurani, who is still young enough to change and live a long life as a productive citizen, the best opportunity for a successful future.

***Lack of Previous Incarceration.*** Mr. Nurani's lack of previous incarceration also supports a sentence below the advisory guideline range. Mr. Nurani's total lack of criminal history is a mitigating factor and why the Sentencing Commission has included a reduction for specific zero-point offenders. Even if the Court does not reduce Mr. Nurani's guideline range, this lack of criminal history can factor into a downward variance.

Mr. Nurani has never before been to prison. Quite naturally, any prison term—even the six months Mr. Nurani has spent in custody pending disposition of this case—will have a greater effect on Mr. Nurani and his likelihood to reoffend than an individual who has served significant prison or jail time in the past.

Additionally, Mr. Nurani has no history of violence. Prison is a purely punitive sanction, and is not tied to providing correctional and rehabilitative treatment. *See* 18 U.S.C. § 3582(a) (stating that "imprisonment is not an appropriate means of promoting correction and

15

rehabilitation"). Mr. Nurani is a gentle, soft-spoken young man who could easily be eaten up in prison. The 10-year sentence advocated for by the government is unnecessary to send the message of deterrence to an individual who has not previously faced a term of imprisonment. *See United States v. Baker*, 445 F.3d 987, 990 (7th Cir. 2006) (affirming below-guidelines sentence premised in part on a finding that "a prison term would mean more to [the defendant] than to a defendant who previously had been imprisoned").

He has some strengths which will help him in rehabilitation, including the fact that he graduated from high school. He also has been previously employed. In the future, Mr. Nurani hopes to maintain employment, first by gaining his CDL and eventually completing college with a computer science degree.

### ***Collateral Consequences of Felony Conviction and Punitive Nature of Supervision.***

The Court should also consider the impact a felony conviction will have on Mr. Nurani's life moving forward. As a result of his offense, Mr. Nurani, at the threshold of adulthood, will be branded a felon for the rest of his life. He will lose the right to vote,[5] to serve on a jury,[6] and to possess firearms. In addition to those more-tangible consequences stemming from his felony conviction, Mr. Nurani will face constraints such as limitations on employability,[7] housing,[8] and

---

[5] If Iowa Executive Order 7 is still in effect when Mr. Nurani discharges any sentence imposed, his voting rights may be restored. *See Voting Rights Restoration*, Off. of the Governor of Iowa , https://governor.iowa.gov/services/voting-rights-restoration (last visited July 7, 2025).
[6] 28 U.S.C. § 1865(b)(5).
[7] The state of Iowa does not restrict employers from inquiring into prior criminal history or making adverse employment decisions based on the same. *See Iowa Ass'n of Bus. & Indus. v. City of Waterloo*, 961 N.W.2d 465, 477–58 (Iowa 2021) (upholding, in part, city's "ban the box" ordinance).
[8] *See, e.g.*, Iowa Legal Aid, *Finding Housing with a Criminal Record*, https://www.iowalegalaid.org/resource/finding-housing-with-a-criminal-record?ref=qzJhn (Apr. 1, 2021) ("Many landlords will not rent to someone with a criminal record.").

the social stigma associated with being a convicted felon.[9] The mere fact of a felony conviction will, for Mr. Nurani, reflect the seriousness of the offense and provide an additional punitive and deterrent impact to that offered by the time he has already served, and the term of supervision to follow.

If the Court determines that a death resulted from this offense Mr. Nurani will have the additional consequences of not being eligible for RDAP, a program he desperately needs, and he will be ineligible under the First Step Act to earn time off his sentence. This is a substantial punishment for someone with no previous criminal history and with a serious addiction.

The Court should also not discount the ability of a term of supervision to advance the § 3553(a) factors. *See United States v. Coughlin*, No. 06-20005, 2008 WL 313099, at *10 (W.D. Ark. Feb. 1, 2008) (concluding "punishment [can be] achieved by probation, home detention, and community service"). Mr. Nurani will have at least a four-year period of supervised release. During that time an offender is subject "to several standard conditions that substantially restrict their liberty." *Gall v. United States*, 552 U.S. 38, 48 (2007) (citing *United States v. Knights*, 534 U.S. 112, 119 (2001)). "Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *Id.* (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987))). As the *Gall* Court noted, "[p]robationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a

---

[9] *See generally United States v. Nesbeth*, 188 F. Supp. 3d 179 (E.D.N.Y. 2016) (discussing in depth history and evolution of collateral consequences, and considering collateral consequences in § 3553(a) analysis).

felony, and refrain from excessive drinking. USSG § 5B1.3.  Most probationers are also subject to individual 'special conditions' imposed by the court." *Id*. at 48–49 & 48 n.4.

Additionally, this Court should consider the harmful effects that will result from lengthy incarceration in comparison to any potential benefits.  Mr. Nurani has a familial support system and ties to the community, and no history of violence.  "The experience of incarceration will remove [him] from [his] famil[y] and communit[y] and whatever ties [he] may retain to the non-criminal world." *United States v. Bannister*, 786 F. Supp. 2d 617, 658–59 (E.D.N.Y. 2011).  He is at low risk for reoffending.

> Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences.  Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society.  Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.

*Id.* (quoting Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment* 7 (2010), https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf).  A term of imprisonment will deteriorate Mr. Nurani's familial relationships—"Because prisons are often located in rural areas, and because convicts' families and friends have limited ability to travel, convicts' relationships with people on the outside—the people most likely to motivate convicts to lead straight lives—may be eroded seriously during long terms of imprisonment." *Id.* at 659.  The Court should take into account these collateral consequences of incarceration when deciding on an appropriate sentence in this case.

### D. Restitution.

If the Court sustains Mr. Nurani's objection to the conclusion that C.M. died from ingesting fentanyl from him, the Court should decline to impose a restitution order because C.M. is not a "victim" of Mr. Nurani's offense as defined in 18 U.S.C. § 3663. *See* 18 U.S.C. § 3663(a)(2) (defining "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered"). If the Court overrules Mr. Nurani's objection, Mr. Nurani agrees that the Court has discretion to impose restitution under 18 U.S.C. § 3663. However, at this time no restitution request has been received.

If there is a documented restitution request for funeral expenses, Mr. Nurani asks the Court to consider, consistent with 18 U.S.C. § 3663, "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3663(a)(1)(B)(i)(II). Here, Mr. Nurani has no income due to his custodial status. Although he does not currently have any expenses, upon his release, he will be tasked with starting a new life for himself. Depending on the sentence imposed by the court, Mr. Nurani's custodial status could severely constrain his earning capacity for the foreseeable future. Hopefully Mr. Nurani will be eligible for a work assignment once transferred to the Bureau of Prisons (BOP). Starting pay for typical work assignments in BOP is $0.23 per hour, which can increase as one moves up in grade until reaching the maximum compensation rate of $1.15 per hour. *See* BOP Program Statement 8120.03 § 345.51 (Feb. 23, 2017). If the Court concludes restitution is appropriate, Mr. Nurani asks the Court to take these financial circumstances into account when fashioning a restitution order.

## V. CONCLUSION

Mr. Nurani's immaturity, addiction, and poor judgment have taught him a hard lesson that will follow him for the rest of his life. Mr. Nurani recognizes what he needs to do to continue his sobriety and put his past behind him and to succeed in the future. For these reasons, Mr. Nurani respectfully submits that a sentence of 60 months, to be followed by a 4-year term of supervised release, is sufficient, but not greater than necessary under 18 U.S.C. § 3553(a).

Respectfully submitted,

*/s/ Melanie S. Keiper*
MELANIE S. KEIPER, Asst. Federal Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610
FAX: (515) 309-9625
E-MAIL: melanie_keiper@fd.org
ATTORNEY FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2025, I electronically filed this document with the Clerk of Court using the ECF system, which will serve it on the appropriate parties.

*/s/ Morgan Conn*, Paralegal